**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CHRISTOPHER DILLARD, MEL JENKINS,
JIMMIE REED JR., and QUIJOHNNA WILSON,

        Plaintiffs,

                                Case No. 05-CV-72621-DT

v.

INALFA ROOF SYSTEMS,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S "MOTION FOR
SUMMARY JUDGMENT," DISMISSING WITHOUT PREJUDICE
PLAINTIFFS' STATE LAW CLAIMS AND DENYING AS MOOT DEFENDANT'S
"MOTION FOR SEVERANCE AND SEPARATE TRIAL FOR
PLAINTIFF DILLARD'S CLAIMS"**

      Pending before the court is Defendant's April 6, 2006 "Motion for Summary

Judgment" and "Motion for Severance and Separate Trial for Plaintiff Dillard's Claims."

These motions have been fully briefed and the court held a hearing in this matter on

June 28, 2006.  For the reasons stated below, the court will grant Defendant's motion

for summary judgment with respect to Plaintiffs' federal claims, dismiss without

prejudice Plaintiffs' state law claims, and deny as moot Defendant's motion for

severance.

**I.  BACKGROUND**

      Defendant Inalfa Roof Systems ("Inalfa") is a supplier of sunroof systems to the

automotive industry (Def.'s Br. at viii.)  Inalfa has two assembly plants in Michigan, one

located in Auburn Hills and one in Grand Blanc.  (O'Mara Dep. at 13.)

Inalfa employs all of the Plaintiffs, Jimmie Reed, Jr. ("Reed"), Christopher Dillard ("Dillard"), Quijohnna Wilson ("Wilson"), and Mel Jenkins ("Jenkins"), in a unit covered by the Collective Bargaining Agreement ("CBA") between Inalfa and the United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"). (CBA at 1, Def.'s Mot. at Ex. 3.)  Plaintiffs are employed at Inalfa's Auburn Hills plant. Plaintiffs' terms and conditions of employment, compensation, benefits, health care, time off, and personal days are governed by the CBA, which also contains a grievance procedure culminating in final and binding arbitration.  (*Id.* at 1-9; Wilson Dep. at 6-7; Reed Dep. at 18-19; Dillard Dep. at 19-20; Jenkins Dep. at 11-12.)  Inalfa has adopted a non-discrimination policy, which is set forth in the CBA and in the Infalfa Employee Handbook. (Def.'s Mot. at Ex. 3 at 1, 10.)  The policy establishes a grievance procedure to resolve the complaints of any employee who "feels subjected to discrimination or harassment" in connection with employment at Inalfa.  (*Id.* at 10.)  The CBA also specifies a Grievance Procedure to address employee complaints under the Agreement.  (*Id.* at 7-9.)

### A.  Summary of Plaintiffs' Claims

<u>Plaintiff Mel Jenkins</u>

Plaintiff Mel Jenkins is a 27-year old African American, who has worked at Inalfa from the year 2000 to the present.  (Jenkins Dep. at 4; Jenkins Aff. at ¶¶ 4-5, 7.) Plaintiff Jenkins worked on the second shift of the Glass Bonding line from fall 2002 until the end of December 2004.  (Jenkins Aff. at ¶¶ 8-9.)  During Plaintiff Jenkins' time as a Glass Bonder, his shift supervisors were Ken Pallaske ("Pallaske") and Janice Stimmel ("Stimmel.").  (*Id.* ¶¶ at 11, 18.)

Plaintiff Jenkins alleges a number of "regular and frequent incidents of racial harassment and intimidation" at the hands of Pallaske and Stimmel. (*Id.* at ¶¶ 13-16, 19-23.) Plaintiff Jenkins testified that, between 2002 and September 2003, Pallaske would follow Plaintiff Jenkins and other African American workers around the plant floor while they performed their work, while not following Caucasian workers around during the same period. (*Id.* at ¶ 14.) According to Plaintiff Jenkins, African-Americans were systematically singled out for not wearing safety glasses, while Caucasian workers were allowed to walk about the plant floor without wearing safety glasses. (*Id.* ¶ at 15.) Plaintiff Jenkins also testified that, on one particular occasion in October 2003, Pallaske approached Plaintiff Jenkins and the other Plaintiffs working on the Glass Bonding line and proceeded to make the comment, "[T]his is the darkest area in the plant." (Jenkins Dep. at 57.)

During Plaintiff Jenkins' time on the Glass Bonding line, Stimmel was also a shift supervisor. (Jenkins Aff. at ¶ 18.) According to Plaintiff Jenkins, Stimmel made repeated comments that "black people eat certain foods like fried chicken and pig feet." (*Id.* at ¶ 20.) On other occasions, Plaintiff Jenkins alleges, Stimmel stated that "Cracker Barrel is where black people eat." (*Id.* at ¶ 21.) Plaintiff Jenkins further alleges that Stimmel made "reference to black culture portraying African Americans in a negative, stereotypical fashion." (*Id.* at ¶ 23.) Plaintiff Jenkins also testified that he lodged complaints with his immediate supervisor, Plaintiff Reed, following each of the cited statements by Stimmel. (Jenkins Dep. at 70.) Plaintiff Jenkins alleges that he also reported the incidents to Inalfa's Human Resources Department starting in the middle of 2003. (*Id.* at 72.) Plaintiff Jenkins further alleges that, during a meeting with Plaintiffs in

3

response to instances of alleged harassment, Vice President of Human Resources

David Peshke ("Peshke") stated to Plaintiffs, "[H]ere's one of your brethren calling right

now," after receiving a phone call.  (*Id.* at 178.)

Plaintiff Quijohnna Wilson

Plaintiff Quijohnna Wilson, a 32 year-old African American male, began working

at Inalfa in August 1999.  (Wilson Aff. at ¶¶ 4-5; Pls.' Resp. at 5.)  Wilson worked on the

Glass Bonding Line and was supervised by Pallaske between April 2002 and

September 2003.  (Wilson Aff. at ¶ 6.)  Plaintiff Wilson was also supervised by manager

William Bonk ("Bonk") from June 4, 2004 until January 2005 and by Stimmel from 2002

until December 2004.  (*Id.* at ¶¶ 7-9.)  Plaintiff Wilson testified that he had daily contact

with Pallaske, Bonk, and Stimmel during these periods.  (*Id.*)

Plaintiff Wilson alleges that he suffered racial harassment from Pallaske while

Pallaske was his shift supervisor.  (*Id.* at ¶ 11.)  More specifically, Plaintiff Wilson

testified that Pallaske referred to him as "Boy" and "Homeboy."  (*Id.*)  Plaintiff Wilson

further testified that Pallaske informed him, "I'm watching you."  (*Id.*)  According to

Plaintiff Wilson, Pallaske admonished and disciplined him and other African American

employees for failing to wear safety glasses, while neglecting to hold Caucasian

employees to a similar standard.  (*Id.*)  Plaintiff Wilson alleges that Pallaske told him,

"[I]f you are black, you work in the back" and, in Plaintiff Wilson's presence, referred to

the Glass Bonding line as "the darkest area" in the plant.  (*Id.*)  Plaintiff Wilson testified

that Pallaske admonished him and other African Americans on multiple occasions for

eating on the plant floor, while failing to address similar consumption of food by

Caucasians.  (*Id.*)  Plaintiff Wilson further testified that Pallaske repeatedly admonished

4

him for sitting while working on the line, while permitting Caucasians to sit during their work on the line.  (*Id.*)

Plaintiff Wilson also alleges that he suffered racial harassment from Stimmel while she was his shift supervisor.  (Jenkins Aff. at ¶ 12.)  According to Plaintiff Wilson, Stimmel made comments during the course of 2004 about the type of foods "black people like to eat such as fried chicken and pig feet."  (*Id.*)  Plaintiff Wilson also testified that Stimmel inquired of him whether he "liked to eat fried chicken, fatbacks, and pigs feet at a Cracker Barrel Restaurant."  (*Id.*)  Stimmel, according to Plaintiff Wilson, spoke to him about "making her 'booty call' when she supervised the Glass Bonding line."  (*Id.* (quotations in original).)

Plaintiff Wilson further alleges that, during the meeting with Plaintiffs in response to instances of alleged harassment, Peshke stated to Plaintiffs, "[T]his is your brethren calling right here on the phone."  (*Id.* at ¶ 18.)

<u>Plaintiff Jimmie Reed, Jr.</u>

Plaintiff Jimmie Reed, Jr. a 29 year-old African American, began his employment in October 1995.  (Reed Aff. at ¶ 4; Pls.' Resp. at 7.)  Reed has been the line leader on the Glass Bonding Line since 1996.  (Reed Aff. at ¶ 6; Pls.' Resp. at 7.)  Reed was supervised by Pallaske from 2002 until September 2003, by Stimmel from 2002 to December 2004, and by Bonk from June 2004 to September 2005.  (Reed Aff. at ¶¶ 7-8, 10.)

Plaintiff Reed alleges that he suffered racial harassment from Pallaske while Pallaske was his shift supervisor.  (*Id.* at ¶ 9.)  Plaintiff Reed testified that Pallaske

stated, "[I]f you have a strong back, you're black, you work at the end of the line."
(Reed Dep. at 94; Reed. Aff. at ¶ 9.)

      Plaintiff Reed further alleges that he suffered racial harassment from Stimmel
while she was his shift supervisor. (Pls.' Resp. at 7.) According to Reed, Stimmel told
him that "you little black boys kill me" while she "[gave him] the finger." Plaintiff Reed
testified that the incidents involving Stimmel were reported to Human Resources.
(Reed Dep. at 66.)

      Plaintiff Reed also alleges that he suffered racial harassment from Bonk during
Bonk's period as his shift supervisor. (Pls.' Resp. at 7.) According to Plaintiff Reed's
testimony, Bonk stated to him that "[I]t's a white man's world, get it?" (Reed Dep. at
103.) Plaintiff Reed also testified that Bonk referred to him and his African American co-
workers as "you people." (Reed Aff. at ¶ 15.)

      Plaintiff Reed further testified that Stimmel and Bonk admonished him and other
African Americans for eating on the plant floor while they allegedly allowed Caucasian
co-workers to eat on the plant floor. (*Id.* at ¶ 11.)

<u>Plaintiff Christopher Dillard</u>

      Plaintiff Christopher Dillard, an African-American, began his employment with
Defendant in May 1995. (Dillard Aff. at ¶¶ 5-6.) Plaintiff Dillard worked on the second
shift and, accordingly, was managed by Stimmel and Pallaske, despite being employed
in an area other than on the Glass Bonding line. (*Id.* at ¶¶ 6, 13; Pls.' Resp. at 8.)

      Plaintiff Dillard alleges that he suffered racial harassment from Pallaske while
Pallaske was his shift supervisor. (Dillard Aff. at ¶ 7.) Plaintiff Dillard testified that
Pallaske admonished him for not wearing safety glasses in the plant while allegedly

6

failing to respond to his Caucasian co-workers' failure to wear safety glasses.  (*Id.* at ¶ 10.)  Plaintiff Dillard further testified that Pallaske "excessively criticized" his work performance and clothing - as well as those of other African American employees - while not commenting on deficiencies in Caucasians' work performance and clothing perceived by Plaintiff Dillard.  (*Id.* at ¶ 9.)

Plaintiff Dillard further alleges that he suffered racial harassment from Stimmel while she was his shift supervisor.  (Pls.' Resp. at 8.)  Plaintiff Dillard testified that Stimmel "frequently questioned [his] need [and the need of other African-Americans]. . . to use the restroom while Caucasians were not questioned about their need to use the restroom."  (Dillard Aff. at ¶ 14.)  Plaintiff Dillard further testified that Stimmel "frequently assigned [him] unnecessary and undesirable tasks (like cleaning out old robots which were no longer in use) while allowing Caucasians to talk and socialize about matters unrelated to work."  (*Id.* at ¶ 16.)

Plaintiff Dillard also alleges that Bonk, while his supervisor, "regularly reprimanded [him] for talking with fellow co-workers while allowing Caucasian counterparts to talk."  (*Id.* at ¶ 18.)

### B.  Timeline of Plaintiffs' Complaints and Defendant's Response

Defendant alleges that "overtime distribution is an ongoing issue with production employees of all races."  (Defs.' Mot. at xiii.)  Accordingly, UAW representatives discussed employee overtime concerns with Inalfa representatives.  (*Id.* at Ex. 15 at 1.)

In August 2004, second shift employees, comprising Plaintiffs and other employees, namely Johnny Alexander and Trafen Anderson, approached Bonk with

concerns about overtime distribution.  (Bonk Dep. at 59; Acosta Aff. at ¶ 4.)[1]  Bonk

testified that he brought the concerns to Acosta.  According to Acosta, he and Bonk met

with the employees and their UAW representative to address the concerns.  (Acosta Aff.

at ¶¶ 4-5.)  Acosta testified that he and Bonk created a written process and forms for

the distribution of overtime.  (*Id.* at ¶ 6.)  Acosta testified that Bonk subsequently

prepared a memorandum confirming the overtime process in response to the

employees' concerns, and that Bonk distributed it to the employees at a follow-up

meeting on September 23, 2004.  (*Id.* at ¶ 7; Bonk Dep. at 57-60.)

Acosta testified that, during the September 23, 2004 meeting, employees

expressed complaints about Stimmel, including allegations that she had made

comments of a sexual nature.  (Acosta Aff. at ¶ 9.)  Acosta requested that the

employees reduce their concerns to writing.  (*Id.* at ¶ 10.)  On September 28, 2004,

Acosta gave the written statements of Plaintiffs Jenkins, Reed, and Wilson, as well as

non-parties Jonathan Calvin, Shuante Calvin, and Johnny Alexander, to Denise Fletcher

in Human Resources.[2]  (*Id.* at ¶ 11; Def.'s Mot. at Ex. 18, 1-6.)  The designated

Plaintiffs' statements described many of the allegations documented above.  (*See* Def.'s

Mot. at Exs. 19-21; *see also* Defs.' Br. at xiii.)  On September 30, 2004, Plaintiffs

Jenkins and Wilson filed grievances with the UAW alleging racial discrimination.  (Def.'s

Mot. at Ex. 22.)

---

[1]Fred Acosta became a Production Manager for Defendant in 2004.  (Acosta Aff. at ¶ 3.)

[2]Defendant asserts that Plaintiff Dillard did not submit a written statement at this time, but that he asked to be included in the investigation.  (Def.'s Mot. at xiii; *see also* Dillard Dep. at 119.)

Inalfa HR Administrator Denise Fletcher testified that, upon receiving the individual Plaintiffs' statements, she reviewed them, then contacted Auburn Hills Operations Manager Jim Bonebright ("Bonebright") and Acosta to schedule a meeting. (Fletcher Dep. at 21.)  Shortly thereafter, according to Fletcher, she met with Bonebright and Acosta to discuss the statements and to develop a plan to investigate.  (*Id.* at 21-24; Def.'s Mot. at Ex. 18 at 1.)  Fletcher testified that she, Bonebright, and Acosta agreed to schedule training regarding sexual harassment and diversity for all employees, as well as to meet individually with each of the complaining employees. (Fletcher Dep. at 23-24.)  On October 5, 2004, Fletcher prepared a schedule of interviews and coordinated notice of the individual interview times through Bonk.  (Def.'s Mot. at Ex. 18 at 1.)  Fletcher testified that Robert Williams, UAW Local 155 Representative, contacted her on October 6, 2004, having received copies of the grievances, in order to request that Richard Orr, Union Steward, be included in the individual employee meetings.  (Fletcher Dep. at 52-53.)

Inalfa's Human Resources Department began its investigation by conducting individual meetings with the complaining employees, which took place on October 7, October 8, and October 11, 2004.  (Def.'s Mot. at Ex. 18 at 1-6.)  In addition to reiterating many of the concerns previously documented by the employees in their written complaints, (*see* Def.'s Mot. at Exs. 19-21), Inalfa's Investigative Timeline indicates that Plaintiffs Reed and Jenkins verbalized during their individual meetings a perception of supervisory favoritism by Stimmel.  (Def.'s Mot. at Ex. 18 at 1, 3). According to the Timeline, Wilson reported that he was offended by Stimmel spreading news that his house had burned down.  (*Id.* at 4.)  The Timeline further states that

Dillard claimed that Stimmel singled him out "to clean robot" and "goes right to him" if he "does something wrong," but "[i]f someone else does something wrong . . . then the whole group is called in." (*Id.*)  In addition to the investigation by Inalfa's management, after receiving copies of the grievances, UAW's Williams conducted individual meetings with each of the grieving employees on behalf of the union.  (O'Mara Dep. at 44.)

Inalfa hired an outside consultant to conduct sexual harassment and diversity training for the office staff on November 2 and 4, 2004.  (Def.'s Mot. at Ex. 32 at 1-2.) O'Mara testified that he met with the grieving employees on November 9, 2004 to assure the attendees that Inalfa "understood what their concerns were and . . . [was] going to take appropriate action . . . ."  (O'Mara Dep. at 49.)  O'Mara further testified that he had met with Stimmel and that Stimmel had denied the allegations of the grieving employees.  (*Id.* at 47.)  O'Mara testified that a decision was made in early November 2004 to terminate Stimmel.  (*Id.*)  O'Mara also testified that, as a result of the investigation into the complaints, Stimmel was removed from a management position at Inalfa during the second week of December 2004.  (*Id.* at 47, 55.)  Stimmel was then reassigned to write instructions as to "how to package up parts for shipment to warehouses," during which time she worked on the bottom floor of the plant in the offices.  (Stimmel Dep. at 161-62.)  Stimmel's last day at Inalfa was February 5, 2005. (Def.'s Mot. at xvii; Stimmel Dep. at 158-59.)

Plaintiffs individually filed charges of discrimination with the EEOC on the following dates: Plaintiff Wilson on December 13, 2004; Plaintiff Reed on December 20, 2004; Plaintiff Jenkins on February 1, 2005; and Plaintiff Dillard on March 15, 2005. (Def.'s Mot. at Ex. 27.)  The charges filed by Plaintiffs Reed, Johnson, and Wilson were

10

dismissed by the EEOC.  Subsequent to the filing of the instant lawsuit, Plaintiff Dillard's

EEOC file was closed on August 5, 2005 due to the pending litigation.  (Def.'s Mot. at

Ex. 28.)

Plaintiffs initiated this action on June 30, 2005.[3]  Their complaint consists of four

counts, comprising two federal and two state law claims: (1) Count I: "Racial

Discrimination" under Title VII; (2) Count II: "Racial and Sexual Harassment" under Title

VII; (3) Count III: "Racial Discrimination" under the Michigan Elliott-Larsen Civil Rights

Act; and (4) Count IV: "Racial and Sexual Harassment" under the Michigan Elliott-

Larsen Civil Rights Act.[4]

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when

there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has

carried its burden of showing that the pleadings, depositions, answers to interrogatories,

admissions and affidavits in the record. construed favorably to the non-moving party, do

not raise a genuine issue of material fact for trial, entry of summary judgment is

appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317 (1986)).

---

[3] Pursuant to the parties' stipulation, the court entered an order dismissing
Plaintiff Jonathan Calvin with prejudice on January 11, 2006.

[4]Plaintiffs assert in their response to Defendant's motion that their discrimination
claims should be dismissed and "admit [ ] that [P]laintiffs will not be pursuing claims of
discrimination at trial."  (Pls.' Resp. at 15.)

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of a factual dispute alone, does not, however, defeat a properly supported motion for summary judgment - the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (emphasis and alteration in original)). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'" (citation omitted)). The court does not weigh the evidence to determine the truth of the matter but to determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003.)

## III.  DISCUSSION

### A.  300 Day Window for Title VII Claims

As a general rule, claims alleging a violation of Title VII must be filed with the

EEOC within 300 days of the most recent act of alleged discrimination.  *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).  In its motion for summary

judgment, Defendant contends that Plaintiffs' federal claims against Pallaske are time

barred.  (Def.'s Mot. at 5.)  In response, Plaintiffs "concede that their federal claims

concerning the conduct of Ken Pallaske are barred for not having filed charges of

discrimination within 300 days of having been exposed to harassment by Ken Pallaske."

(Pls.' Resp. at 9.)  Plaintiffs maintain, however, that "this does not bar . . . [P]laintiffs

from pursuing their federal claims against the defendant for the hostile work

environment created by Janice Stimmel and William Bonk."  (*Id.*)  More specifically,

Plaintiffs argue that "[w]ith respect to the federal civil rights claims concerning the

conduct of Janice Stimmel, William Bonk, and David Peshke, the continuing violations

doctrine is available to the plaintiffs because the unlawful conduct was a series of

ongoing and continuous discriminatory acts with at least one  . . . falling within the

limitations period."  (*Id.* at 10.)

The *Nat'l R.R. Passenger Corp.* Court held that:

Hostile environment claims are different in kind from discrete acts.  Their
very nature involves repeated conduct. . . .  The "unlawful employment
practice" therefore cannot be said to occur on any particular day.  It occurs
over a series of days or perhaps years and, in direct contrast to discrete
acts, a single act of harassment may not be actionable on its own.
***
A charge alleging a hostile work environment claim, however, will not be
time barred so long as all acts which constitute the claim are part of the
same unlawful employment practice and at least one act falls within the
time period.

13

*Id.* at 115, 122 (internal citations omitted).  More specifically, the Sixth Circuit has held that:

> [C]ontinuing violations . . . fall[ ] into two categories of narrowly limited exceptions to the usual rule that statutes of limitations are triggered at the time the alleged discriminatory act occurred.  The first category of continuing violations arises "where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation; that is where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups."  However, "at least one of the forbidden discriminatory acts must have occurred within the relevant limitations period."  The second category of continuing violations arises "where there has occurred a longstanding and demonstrable policy of discrimination.  Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing over-arching policy of discrimination."

*Alexander v. Local 496, Laborers' Intern. Union of North America,* 177 F.3d 394, 408 (6th Cir. 1999) (internal quotations omitted).  Based on the evidence presented to the court, there was a long history of repeated and daily harassment alleged by Plaintiffs concerning not only Pallaske, but also Stimmel and Bonk.  The court determines that Plaintiffs' claims would be timely irrespective of the continuing violations doctrine as Plaintiffs have alleged violations arising from the very conduct of Stimmel and Bonk. *Id.*[5]  Defendant does not attack the timeliness of Plaintiffs' claims as they relate to Stimmel and Bonk.

---

[5]The court will not analyze Defendant's argument, *see* Def.'s Mot. at 6, that Plaintiffs' Title VII claims against Pallaske must be dismissed for failure to exhaust administrative remedies as Plaintiffs have already conceded that Plaintiffs' federal claims based on the conduct of Pallaske must be disregarded.

### B.  Federal Claims Brought by Plaintiff Dillard

Defendant asserts that "Dillard's claims are . . . barred in their entirety because he filed a lawsuit before the EEOC conducted any investigation of his claims.  His EEOC charge was dismissed by the EEOC only because he had filed the instant lawsuit and before any investigation."  (Def.'s Mot. at 7.)  The filing requirement is not met where an employee timely files a charge but withdraws it before the agency has an opportunity to act on it."  (*Id.*)

In response, Plaintiffs assert that "[b]ecause this is a multiple-plaintiff type lawsuit, the 'single-filing rule' is controlling."  (Pl.'s Resp. at 12.)  The court disagrees.  It is well settled that a person who claims to have been discriminated against in violation of Title VII may not seek relief in federal court unless administrative remedies have first been exhausted.  *See United Air Lines v. Evans*, 431 U.S. 553 (1977).  The single-filing rule is a narrow rule which holds that "where a substantially related non-filed claim arises out of the same time frame as a timely filed claim, the complainant need not satisfy Title VII's filing requirement to recover."  *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 840 (6th Cir. 1994).  The court finds instructive the opinion of Hon. Gerald Rosen of this bench in *Branholm v. Home Depot USA*, 225 F. Supp. 2d 762 (E.D. Mich. 2002), in which the court held that "[w]ith respect to [the] [p]laintiff Jenkins, as indicated, [p]laintiff Jenkins filed an MDCR charge but then withdrew it on July 25, 2000 without any investigation or decision having been made by the Commission. . . .  Not having given the Commission the opportunity to attempt conciliation or voluntary settlement, Jenkins also has failed to exhaust his administrative remedies."  *Id.* at 766.  In the instant case, Plaintiff Dillard essentially withdrew his EEOC claim by initiating the instant

15

action prior to the EEOC's disposition of his claim.  (Def.'s Mot. at Ex. 28.)  The court, therefore, determines that Plaintiff Dillard has failed to exhaust his remedies and will grant Defendant's motion for summary judgment as to this plaintiff's federal claims.[6]

### C.  Title VII Hostile Work Environment Claim

Defendant first argues that it is entitled to summary judgment on Plaintiffs' hostile work environment claims under Title VII.  Under Title VII, an employee must show the following:

1) that he is a member of a protected class;
2) that he was subjected to unwelcome racial harassment;
3) that the harassment was based on race;
4) that the harassment had the effect of unreasonably interfering with the work performance by creating an intimidating, hostile, or offensive work environment; and
5) the existence of employer liability.

*Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).  "Actionable harassment exists if 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'"  *Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 605 (6th Cir. 2002) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

Under Title VII, an employer's liability varies depending upon whether the offending employee was a supervisor.  "As for the acts of co-workers, a plaintiff may

---

[6]Because the court will grant summary judgment as to Plaintiffs' claims as they relate to Dillard, the court need not analyze or decide Defendant's motion to sever Dillard's trial.

hold an employer directly liable if she can show that the employer knew or should have known of the conduct, and that its response manifested indifference or unreasonableness." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). As for the acts of supervisors, in 1998 the Supreme Court's decision in two cases invalidated earlier Sixth Circuit law that employers would be held liable only when the supervisor's "harassing actions were foreseeable or fell within his scope of employment" and the employer failed to respond "adequately and effectively." *See Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 184 (6th Cir. 1992). In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held:

> [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 777-78; *see also Ellerth*, 524 U.S. at 765.

"[A]fter *Faragher* and *Burlington Industries,"* the Sixth Circuit explained, "it is no longer enough for an employer to take corrective action; employers now have an affirmative duty to prevent sexual harassment by supervisors." *Williams v. General Motors Corp.* 187 F.3d 553, 561 (6th Cir. 1999)

Further construing *Ellerth* and *Faragher*, the Sixth Circuit has held that

an employer's liability for supervisory sexual harassment depends on the

consequences of the supervisor's actions:

> If proven sexual harassment by the supervisor did not result in a tangible
> employment action, then the employer may not be liable if it engaged in
> preventative or corrective measures and the plaintiff unreasonably failed
> to utilize the measures the employer provided.  If the sexual harassment
> did result in a tangible employment action, the employer will be strictly
> liable for the supervisor's sexual harassment.

*Keeton v. Flying J., Inc.*, 429 F.3d 259, 262-63 (6th Cir. 2005) (citations omitted).

Plaintiffs have established the first three prongs of their prima facie Title VII case.

It is undisputed that Plaintiffs, as African-American employees, are members of the

protected class.  It is also undisputed that Plaintiffs have been subject to unwelcome

racial harassment, and that Plaintiffs' race motivated the harassment.  The court

assumes, without deciding, that Plaintiffs can meet the burden of the fourth prong by

demonstrating that the harassment "had the effect of unreasonably interfering with the

work performance by creating an intimidating, hostile, or offensive work environment."

*Newman*, 266 F.3d at 405.

The court must next focus on whether Defendant is vicariously liable for the

harassment.  The complaint includes allegations that, if proven, would establish that

Plaintiffs were subjected to a tangible employment action (*see, e.g.,* Compl. at ¶ 24

("[T]he African-American line leaders were demoted while the Caucasion workers with

less seniority were advanced and promoted to line leader positions.")), but it appears

that Plaintiffs do not now claim that any such action took place.  Plaintiffs' response brief

does not assert the existence of or point to evidence that could establish a tangible

employment action, and the court can find no evidence that would support such a
finding.

In the absence of a tangible employment action, Defendant will not be liable if it
engaged in preventative or corrective measures and Plaintiffs unreasonably failed to
utilize the measures the employer provided. *See Keeton*, 429 F.3d at 262-63. First, the
court must assess the sufficiency of the preventative and corrective measures taken by
Defendant. Defendant has presented evidence establishing that it instituted
preventative measures, particularly by publishing a policy that "specifically prohibit[ed]
sexual and racial harassment," (Def.'s Mot. at 26) and agreeing in the CBA to provisions
that expressly prohibited discrimination. The CBA states that:

> It is the Company's philosophy and policy that any unlawful discrimination
> against any employee or applicant based on race, color, sex, religion,
> national origin, age, handicap, height, weight, arrest record, veteran or
> marital status or membership in another protected group will not be
> allowed or tolerated.

(Def.'s Mot. at Ex. 3, CBA.) Further, under a section entitled "Employee Recourse," the
CBA states:

> Any employee who feels subjected to discrimination or harassment by any
> manager, management official, other employee, customer, client, or any
> other person in connection with employment at this Company should
> immediately report it to his/her manager or an officer of the Company
> personally. An employee, who is uncomfortable for any reason in bringing
> such a matter to the immediate attention of his/her manager, should report
> the matter to another Company official. Also, any questions about this
> policy, discrimination or harassment should be brought to the attention of
> the Human Resources Department.
>
> Such reports will be investigated promptly. If the report has merit,
> disciplinary action will be taken against the offender. Depending on the

severity of the misconduct, the disciplinary action could range from a warning to termination.

(*Id.*)

Given the non-discrimination/anti-harassment policy in the CBA, as well as the company's grievance procedures, it cannot be disputed that Defendant took "reasonable measures" to prevent racial harassment.

Because Plaintiffs took advantage of the measures through their complaints to management, Defendant cannot show that Plaintiffs "unreasonably *failed* to utilize the measures the employer provided," *Keeton,* 429 F.3d at 262-3 (emphasis added), and therefore cannot establish a *Faragher* affirmative defense based on the "preventive measures" component alone. However, it is also undisputed that Defendant took reasonable "corrective" measures in response to Plaintiffs' complaints.

Defendant points out that "Inalfa . . . took prompt action by investigating . . . Plaintiffs' allegations, holding employee interviews, and scheduling harassment awareness training for all employees and managers." (*Id.* at 29.) Defendant has provided evidence that it scheduled sexual harassment and diversity training sessions on October 26, November 2, and November 4, 2004 (*see* Def.'s Mot. at Ex. 32), and that a UAW representative conducted individual interviews of the employees (*see* O'Mara Dep. at 44, Def.'s Mot. at Ex. 33). In addition, Defendant hired Mr. Andre Teague – an African-American – to replace Stimmel on December 12, 2004 (*see* O'Mara Dep. at 39-56)[7] and Pallaske was transferred to Defendant's Grand Blanc

_____

[7]O'Mara's testimony (which is attached to Defendant's motion) actually concerns the removal of Stimmel, not the hiring of Teague. Plaintiffs, however, do not contest this

facility on September 18, 2003.  (Reed Dep. at 65; Wilson Dep. at 88, 118.)  The court agrees with Defendant that there is no dispute that the corrective measures were taken at least in part to address, and indeed extinguish, the hostile environment within which Plaintiffs suffered these various insults.  As Defendant points out, "[t]he situation was remedied by transferring Stimmel out of the area where she was unable to have contact with the Plaintiffs' and then discharging her."  (Def.'s Mot. at 29.)

Moreover, Defendant's requirement of additional sexual harassment and diversity training was a further effective step to prevent future harassment.  Plaintiffs have produced insufficient evidence to support their statement that "[i]t is undisputed that this unlawful racial harassment continued even after the Plaintiffs filed their Charges of Discrimination – the latest filed on March 15, 2005."  (Pl.'s Resp. at 10.)[8]  Accordingly, there is no showing that Defendant's actions were not reasonably calculated to attempt to actually forestall future insulting racial harassment.

Where the ultimate "corrective" action is taken by the employer (i.e. job termination of the alleged harasser), it is difficult to conceptualize a further requirement under *Faragher/Ellwerth* that the employer also prove that the complaining employee

---

claim in their response to Defendant's motion.

[8] Plaintiffs cite in support their exhibits ## 7,8,10, and 12.  Among these, exhibit #8 (Plaintiff Reed's affidavit) is the only affidavit submitted by a Plaintiff in this matter that states that he was supervised by Bonk until "September 2005." Other Plaintiffs were supervised by Bonk until January 2005.  The Reed affidavit does not state when the alleged harassment by Bonk ended. As to David Peske, Plaintiffs cite his reference to African-American co-workers as "brethern" in October 2004, which occurred *before* Defendant's diversity and anti-discrimination training.  As a matter of law, "[t]he actions taken by the defendant once it knew of the claim of harassment by plaintiff were, objectively, reasonable."  *Ditterline v. State of Illinois*, Nos. 03-857, 04-153, 2006 WL 1663741, *7 (S.D. Ill. 2006).

"unreasonably failed to take advantage of" those "corrective opportunities provided by the employer . . . ."  As discussed above, the *Faragher/Ellwerth* "preventive" component offers an entirely clear-cut scenario.  For example, in *EEOC v. Dinuba*, 222 F.3d 580 (9th Cir. 2000), the Ninth Circuit concluded succinctly that "an unreasonable failure to use any complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden under the second element of the defense."  *Id.* at 587.

Plaintiffs have failed to demonstrate that any racially-tinged incidents occurred after Pallaske's and Stimmel's departure or after the anti-discrimination diversity training.  It is therefore undisputed that Defendant's corrective measures had their intended effect.

An employee's failure to use, i.e., to take advantage of, a *complaint* procedure would ordinarily be easily demonstrated, but a similarly clear-cut manner of showing a "failure to take advantage" of an employer's instituted post-complaint *corrective* measure is difficult to identify; neither the parties' briefs nor the court's independent research reveals any other courts that have squarely considered the issue.  If an employer with an effective complaint procedure in place listens to a complaint of harassment that involves no tangible employment action, investigates, validates and determines to take corrective measures to address the complaint, and, moreover, executes the correction(s), this court concludes that the complaining employee's standing to continue his complaint – in the absence of renewed harassment – is obviated by the *Faragher/Ellwerth* affirmative defense. His complaint has been heard, corroborated and vindicated, perhaps even at the expense of his supervisor's employment.  A plaintiff who continues to complain, exemplified here by the filing of a

22

lawsuit, comprises an example of, or at least the equivalent of an employee who "unreasonably failed to take advantage of . . . corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 777-78.  It is clear that, by continuing their complaints based upon incidents that occurred before the indisputably reasonable and effective corrective measure were taken, Plaintiffs have not "taken advantage of" those measures. *Id.*

The logical implication of the Sixth Circuit's expression in *Williams,* 187 F.3d at 561, also supports this view.  If it was formerly "enough for an employer to take corrective action," *Kauffman,* 970 F.2d at 183-184, but now such corrective measures must be preceded by an "affirmative duty to prevent . . . harassment by supervisors," *Williams,* 187 F.3d at 561, then where it is undeniable that an employer has *both* acted upon its "affirmative duty to prevent . . . harassment" *and* taken "corrective action," the affirmative defense prevails and liability cannot attach.  *Id.*

The court also finds instructive *Walker v. Thompson,* 214 F.3d 615 (5th Cir. 2000), where an argument was made that the employees' refusal to agree to a proposed negotiated settlement constituted a "failure to take advantage" of the employer's intended corrective measures:

> [A]ppellees point to the fact that the [employees] refused to agree to the proposed settlement negotiated by the EEOC. *However, in light of the appellants' testimony that the racial remarks and hostile actions continued* after the internal investigation at Glasfloss, we are not persuaded that the appellants' refusal to sign the proposed settlement demonstrates the second element of this defense as a matter of law.

*Id.* at 627-28 (emphasis added).

23

This statement by the *Walker* court clearly teaches that, absent continued harassment, the employees' refusal to agree to the proposed settlement would have supported the affirmative defense, as plaintiffs would have not "taken advantage of" the remedial action – the settlement – offered by their employer.  While the Fifth Circuit rejected the argument in *Walker* only because offensive remarks continued after the employer began the corrective measure, in the instant case no evidence has been presented that offensive behavior continued.

Also instructive is the recent conclusion of a United States District Court in the Eastern District of New York relative to a claimed *Faragher/Ellerth* affirmative defense. In *Garone v. United Parcel Service, Inc.,* 2006 WL 1755953 (E.D.N.Y. June 27, 2006)*,* the court declared that it was "undisputed that UPS maintained and published to its employees policies that not only prohibited sexual harassment, but protected individuals from retaliation for reporting harassment and pledged to investigate and take action upon both anonymous and attributed complaints," and that "in fact, UPS followed its procedures . . . [i]n response to [the plaintiff's] complaints, . . . investigated the allegations and took action to prevent further harassment."  *Id.* at *20.  Accordingly, the court held that "Defendants [would be] entitled to judgment as a matter of law based on the *Faragher/Ellerth* affirmative defense: UPS exercised reasonable care to prevent and correct promptly any sexually harassing behavior and [the plaintiff] unreasonably failed to take advantage of the preventative or corrective opportunities provided to her."  *Id.*

The court holds that the *Faragher* affirmative defense is deemed effective, and the employer not held strictly liable, where a complaining employee refused to accept corrective action, in favor of simply filing suit, in the wake of 1) his employer providing

24

an effective and reasonable complaint mechanism, 2) the employee making use of the mechanism to his advantage, with the result that 3) his employer did what it reasonably should do under the circumstances and actually remedied the complained-of harassment problems.  Reasonable and effective care exercised by an employer that detects and actually corrects alleged harassing behavior in the workplace is a valid affirmative defense to hostile work environment claims that involve no tangible employment action.

To agree with the result proposed by Plaintiffs here would remove any realistic incentive for an employer to institute complaint mechanisms that lead to effective corrective action.  Where an otherwise productive supervisor has insulted various employees based upon their race, but where curtailing or even terminating his employment would not in the smallest measure protect the employer from suit by the allegedly harassed employee, the court cannot conceive of anything that would motivate an employer to try to correct the harassment by firing the supervisor and risk a potentially expensive claim of illegal termination.  An employer would be equally "damned if it did" as if it did not identify and correct the complained-of harassment problem, and would most likely conclude that it is better to defend one lawsuit than two.

In sum, because there is no dispute supported by evidence that there was no tangible employment action taken against the complaining employees, that the Defendant had met its affirmative duty to prevent harassment by supervisors, and that corrective actions undertaken by Defendant were effective, i.e., no subsequent

harassment occurred, the court will grant Defendant's motion as to Plaintiff's federal harassment claims.

### D.  State Law Claims

The court's supplemental jurisdiction over the state law claims presented in this case are governed by 28 U.S.C. § 1367.  Section 1367 provides in relevant part:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.

28 U.S.C. § 1367(a).

"Supplemental jurisdiction 'is a doctrine of discretion, not of plaintiff's right.'" *Habich v. City of Dearborn,* 331 F.3d 524, 535 (6th Cir. 2003) (quoting *Baer v. R & F Coal Co.,* 782 F.2d 600, 603 (6th Cir.1986)).  Moreover, § 1367(c) grants district courts discretion in determining whether to exercise supplemental jurisdiction over state law claims.  *See Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002).  Section 1367(c) specifically provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –
>
> > (1) the claim raises a novel or complex issue of State law;
> >
> > (2) the claim substantially predominates over claim or claims over which the district court has original jurisdiction,
> >
> > *(3) the district court has dismissed all claims over which it has original jurisdiction, or*

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added).

In *Carnegie-Mellon University v. Cohill*, the Supreme Court held that "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity . . . to decide whether to exercise jurisdiction over a case . . . involving pendent state-law claims."  484 U.S. 343, 350 (1988); *see also Blakely*, 276 F.3d at 863.  The Sixth Circuit has held generally that "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landerfeld*, 994 F.2d 1178, 1182 (6th Cir. 1993).  If, however, the federal claims are dismissed before trial, "the state claims should be dismissed as well."  *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992); *see also Cohill*, 484 U.S. at 350 ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline" to exercise supplemental jurisdiction).

In the instant case, the court finds no independent basis to assert jurisdiction over Plaintiffs' state law claims, and will dismiss without prejudice those claims.

### IV.  CONCLUSION

IT IS ORDERED that Defendants' "Motion for Summary Judgment" [Dkt. # 19] is GRANTED IN PART.  It is granted as to Plaintiffs' federal claims.  Plaintiffs' state law claims are dismissed without prejudice.

27

IT IS FURTHER ORDERED that Defendants' "Motion to Sever Plaintiff Dillard" [Dkt. #17] is DENIED AS MOOT.


S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  August 16, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 16, 2006, by electronic and/or ordinary mail.


S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522